

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 50252 | **DATE** | 5/28/2002 |
| **CASE TITLE** | CARLSON vs. DEPUTY MORDT, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, defendants' motion for summary judgment is granted as to Counts I and II, and Carlson's motion for summary judgment is denied. Because this decision disposes of all the federal claims, the court declines to exercise supplemental jurisdiction over the state law claims in Counts III and IV. See 28 U.S.C. § 1367(c)(3); Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir. 1999). This case is hereby dismissed in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| X | Notices mailed by judge's staff. | MAY 29 2002 | 25 |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| X | Mail AO 450 form. | docketing deputy initials | |
| X | Copy to ~~judge~~/magistrate judge. ✓ | 5-29-02 date mailed notice | |
| /SEC | courtroom deputy's initials | Date/time received in central Clerk's Office | OW mailing deputy initials |

U.S. DISTRICT COURT CLERK
02 MAY 29 PM 2:41

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

RICKY R. CARLSON,            )
                             )
            Plaintiff,       )
                             )   00 C 50252
        v.                   )
                             )   Judge Philip G. Reinhard
                             )
DEPUTY DAVID MORDT, DEPUTY   )
OLSEN, SGT. MARIANI, all individually, )
BOONE COUNTY,                )
                             )
            Defendants.      )

**MEMORANDUM OPINION AND ORDER**

I. *Introduction*

Plaintiff Ricky R. Carlson has filed a four-count amended complaint against defendants David Mordt, Ronald Olsen, and Arnold Mariani, who are sued in their individual capacities, and Boone County. Carlson alleges claims of use of excessive force (Count I) and false arrest (Count II) under 42 U.S.C. § 1983 against Mordt, Olsen, and Mariani, as well as state law claims against all defendants (Counts III and IV). The court has original jurisdiction over Counts I and II based on 28 U.S.C. § 1331 and supplemental jurisdiction over Counts III and IV based on 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b). Before the court are the parties' cross-motions for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56.

II. *Background*

Defendants Mordt and Olsen are deputies with the Boone County Sheriff's Department. (Def. LR56.1(a) ¶¶ 2-3; Pl. LR56.1(a) ¶¶ 4-5) Mordt also is the Sheriff's Department's police

dog handler. (Def. LR56.1(a) ¶ 14) Defendant Mariani is a sergeant with the Boone County Sheriff's Department. (Def. LR56.1(a) ¶ 4; Pl. LR56.1(a) ¶ 6)

At approximately 10:00 p.m. on March 30, 2000,[1] Mordt and Olsen went to Carlson's home in Poplar Grove, Illinois, to serve an arrest warrant on Carlson. (Def. LR56.1(a) ¶¶ 15-16; Pl. LR56.1(a) ¶ 8) The arrest warrant had been issued when Carlson failed to pay a fine following his conviction for driving under the influence of alcohol. (Def. LR56.1(a) ¶ 17) Prior to going to Carlson's home, Mordt ran a criminal history and background check on Carlson, which revealed that Carlson previously had been arrested for domestic battery and an assault. (Id. ¶¶ 18-19) This information was important to Mordt because it indicated that Carlson could be violent. (Id. ¶ 20)

At some point after arriving at Carlson's house, Mordt spoke with Carlson's neighbor, who told Mordt that he believed that Carlson was at home. (Id. ¶ 23) Mordt rang Carlson's doorbell and knocked on the front door, while Olsen went to the back of the house. (Id. ¶ 24) After Mordt had knocked for a few minutes, Laura McClintock, who lived in the house with Carlson, came to the door. (Id. ¶ 27) Mordt told McClintock that he wanted to see Carlson. (Id. ¶ 28) McClintock responded that Carlson was unavailable. (Id. ¶ 29) At that time, Olsen shouted from the back of the house that he saw someone moving in Carlson's garage. (Id. ¶ 30) McClintock then closed and locked the front door. (Id. ¶ 31) Inside the house, McClintock told Carlson that the police were there to serve summons on him. (Id. ¶ 32)

---

[1] Defendants' LR56.1(a) Statement of Fact uses the date March 20, 2000; this appears to be an error.

2

Mordt conferred by radio with his supervisor, defendant Mariani, then returned to Carlson's front door with his police dog, Kimon. (Id. ¶¶ 33-34) This dog had been trained to "bite and hold" to apprehend a person, and releases the person only on command. (Pl. LR56.1(a) ¶ 11; Pl. Add'l Facts ¶ 5) Mordt again knocked on the front door, and announced that he and Olsen were prepared to force the door open, and that a dog would be used to search the house. (Def. LR56.1(a) ¶ 34) The parties dispute whether Mordt also announced that he had a warrant for Carlson's arrest. (Id.; Pl. LR56.1(b) ¶ 34) By this time, defendant Mariani and two private security officers had arrived on the scene. (Def. LR56.1(a) ¶ 36) All the officers began knocking on the doors and windows to the house. (Id.)

Although Carlson denies that the officers stated that they were there to serve an arrest warrant on him, he admits that he was aware that they were looking for him and that they had a police dog. (Pl. LR56.1(b) ¶¶ 34, 36, 37) While the officers attempted to gain access to the house, Carlson entered the attic through a ceiling panel and hid under a pile of insulation. (Def. LR56.1(a) ¶ 37)

Olsen used a garage door opener found in an unlocked car in Carlson's driveway to open the garage door. (Id. ¶ 40) Olsen and Mariani entered the house through the garage, while Mordt remained outside with the dog. (Id. ¶ 41) McClintock asked Olsen and Mariani for a warrant. (Id. ¶¶ 42, 43) Mordt then entered the house with Kimon, who searched the main floor of the house. (Id. ¶ 44) The deputies told McClintock that they knew that Carlson was in the house, and that she should tell them where he was "because, otherwise, somebody is going to end up getting shot." (Id. ¶ 46)

3

Olsen noticed that the ceiling access panel to the attic was ajar and that pieces of insulation or drywall were on the floor. (Id. ¶ 48) According to defendants, Mordt announced that the dog would be sent into the attic if Carlson did not surrender. (Id. ¶ 50) Carlson admits that he heard one of the deputies state that he had a dog, but denies that he was warned to surrender to avoid facing the release of the dog. (Pl. LR56.1(b) ¶¶ 50, 51, 53) Mordt used a flashlight to try to spot Carlson. (Def. LR56.1(a) ¶ 51). When Carlson did not show himself, make a sound, or otherwise attempt to surrender, Mordt released the dog in the attic. (Id. ¶¶ 52, 54) The dog dug through the insulation where Carlson was hiding, and bit and held Carlson by the arm. (Id. ¶ 55) Carlson then surrendered by sitting up and showing his hands to Mordt. (Id. ¶ 58) Carlson crawled through the attic access panel and down the step ladder. (Id. ¶ 59) Olsen placed Carlson face down on the floor and handcuffed Carlson's hands behind his back. (Id. ¶ 60)

Mordt then started to lower the dog from the attic to Mariani. (Id. ¶¶ 61, 62) During that process, the dog was dropped. (Id. ¶ 62; Pl. LR56.1(a) ¶ 19) When the dog hit the floor, it went after Carlson and bit him on the buttocks and legs. (Def. LR56.1(a) ¶ 63) Mariani and Olsen, who were in the hallway with Carlson, backed away. (Id. ¶ 65) The attack lasted somewhere between less than a minute and seventy seconds. (Id.; Pl. LR56.1(b) ¶ 70) The attack ended when McClintock's dog attacked the police dog, and then one of the deputies grabbed the police dog. (Def. LR56.1(a) ¶¶ 68-69; Pl. LR56.1(b) ¶¶ 68-69)

Carlson was allowed to clean off in a bathroom, then was transported to a hospital for treatment. (Def. LR56.1(a) ¶¶ 71, 73) He was then taken to the Boone County Public Safety Building, where he was charged with obstructing a peace officer and jailed on the warrant. (Id. ¶

4

75) Carlson later agreed to a finding of guilt and the entry of a judgment of conviction on the charge of obstructing a peace officer. (Id. ¶ 76)

III. *Analysis*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000); Equal Employment Opportunity Comm'n v. Sears, Roebuck & Co., 233 F.3d 432, 437 (7th Cir. 2000). The moving party bears the initial burden of demonstrating that no material issue exists for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the nonmoving party must offer specific facts demonstrating that a material dispute exists, and must present more than a scintilla of evidence to support its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

The court first considers defendants' motion for summary judgment as to plaintiff's false arrest claim. A person arrested pursuant to a facially valid warrant cannot prevail on a § 1983 or a Fourth Amendment false arrest claim. Juriss v. McGowan, 957 F.2d 345, 350 (7th Cir. 1992) (citing Baker v. McCollan, 443 U.S. 137, 143 (1979)). Here, plaintiff does not dispute that he was arrested pursuant to a bench warrant, and offers no evidence that would call into question the process under which the warrant issued. Accordingly, summary judgment is granted in favor of defendants as to Count II of plaintiff's amended complaint.

The court next considers defendants' motion for summary judgment as to plaintiff's excessive force claim. Although plaintiff alleges excessive force in a single count in the amended complaint, there really are two separate incidents that could raise an issue of excessive force: first, the incident in which the police dog located Carlson and secured him by biting and holding his arm; and second, the incident in which the police dog attacked Carlson after having been dropped. The court considers each incident in turn.

Mordt, Olsen, and Mariani assert that the doctrine of qualified immunity protects them from liability on the claim of excessive force during plaintiff's arrest. Law enforcement officers are entitled to qualified immunity to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A court presented with a qualified immunity issue on summary judgment must first determine whether, "[t]aken in the light most favorable to the party asserting the injury,...the facts alleged show the officer's conduct violated a constitutional right[.]" Saucier v. Katz, 533 U.S. 194, 201 (2001). If the court finds that no constitutional right would have been violated if the allegations were established, the court need not consider the qualified immunity issue further. Id. If, however, a violation could be made out, the court must then determine whether the right was clearly established. Id.

To determine whether an officer's use of force during an arrest violated the Fourth Amendment, the court must examine whether the officer's actions were objectively reasonable, in light of the totality of circumstances confronting him. See Graham v. Connor, 490 U.S. 386, 397 (1989). This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an

6

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. A police officer's authority to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id.

In this case, although the offense at issue – failure to pay a fine in a DUI case – was relatively minor, other factors lead the court to conclude that defendants' use of a police dog to effect plaintiff's arrest was reasonable. Plaintiff's criminal history revealed prior arrests for both battery and assault, crimes of violence. Knowing that the deputies were looking for him, plaintiff evaded the officers by hiding in an unlit attic, from which he easily could have ambushed or otherwise physically resisted them. Although plaintiff disputes that the deputies warned him that they intended to release a police dog to find him, he admits that he knew that law enforcement officers were in his house looking for him and that he heard an officer say that he had a police dog. Under these circumstances, there was no unconstitutional use of force to effect plaintiff's arrest.

Even if the court were to find that this force were not objectively reasonable, however, Mordt, Olsen, and Mariani would still be entitled to qualified immunity. Carlson has not come forward with any cases establishing the unlawfulness of using a police dog to effect an arrest when the intended arrestee has a history of arrests for assaultive crimes, has hidden from police in a location that would provide a strategic advantage to him against the police, and where the police have informed him that they were using a dog to search for him. See, e.g., Kernats v. O'Sullivan, 35 F.3d 1171, 1176 (7th Cir. 1994) (plaintiff bears the burden of demonstrating that a constitutional right is clearly established). Reasonable officers in the deputies' position would

7

not have known that the use of a police dog under the circumstances presented to them violated a clearly established constitutional right of plaintiff.[2] Accordingly, the doctrine of qualified immunity protects them from liability as to plaintiff's claim of excessive force in effecting his arrest.

The court next considers whether the deputies used excessive force when the police dog attacked plaintiff after the dog was dropped from the attic. The parties disagree as to what standard applies to an analysis of force used against a person shortly after arrest: plaintiff argues that a Fourth Amendment analysis applies, while defendants argue that the court should use a due process standard. The Supreme Court has held that all claims of excessive force used "in the course of an arrest, investigatory stop, or other 'seizure'" should be analyzed under a Fourth Amendment standard, rather than under a due process standard. See Graham, 490 U.S. at 395. By contrast, claims of excessive force used against a "pretrial detainee" are analyzed under a due process approach. See id. at 395 n.10. The Seventh Circuit has not made clear at precisely what point an arrest ends, and pretrial detention begins. See, e.g., Proffitt v. Ridgway, 279 F.3d 503, 506 (7th Cir. 2002) (analyzing excessive force claim under due process standard where action occurred en route to jail following arrest); Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 596 (7th Cir. 1997) (acknowledging struggle with the issue, and analyzing excessive force claim under Fourth Amendment where conduct in question occurred shortly after arrestee was handcuffed); see also Wilkins v. May, 872 F.2d 190, 194 (7th Cir. 1989) (pre-Graham case rejecting concept that seizure continues after time person is in custody).

---

[2] Because the court rests its decision on these grounds, the court does not reach the issue of whether plaintiff's conviction of obstructing a peace officer would preclude a finding of excessive force under Heck v. Humphrey, 512 U.S. 477 (1994).

8

The court concludes that in this case, when the police dog was dropped from the attic, Carlson's arrest was still ongoing. At that time, Carlson had not been removed from his house, where he had been apprehended. The attack occurred immediately after Carlson was handcuffed, while he was still on the floor. These circumstances closely resemble those presented in <u>Estate of Phillips v. City of Milwaukee</u>, in which the Seventh Circuit stated that there was "no question that...the complained-of police actions occurred during the course of [the] seizure" when those actions took place when the petitioner was on the floor of his hotel room, shortly after having been handcuffed. <u>Estate of Phillips</u>, 123 F.3d at 596. Similarly, here the second dog attack occurred during the course of Carlson's seizure, and consequently the court must analyze Carlson's excessive force claim as to that incident under the Fourth Amendment.[3]

The court's first step in determining whether a Fourth Amendment violation has occurred is to decide whether there has been a "seizure." As the Supreme Court has noted, "the Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." <u>Brower v. County of Inyo</u>, 489 U.S. 593, 596 (1989) (internal citation omitted). Thus, for Fourth Amendment purposes, a "seizure" occurs only when there is "a governmental termination of freedom of movement *through means intentionally applied.*" <u>Id.</u> at 597 (emphasis in original). As the <u>Brower</u> Court explained, "if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment." <u>Id.</u>

---

[3] Plaintiff argues that defendants have waived this issue for summary judgment because they failed to make a Fourth Amendment argument. However, plaintiff will not be prejudiced by the court's analysis of this issue under the Fourth Amendment, since plaintiff himself urged the court to use the Fourth Amendment standard and made arguments as to how that standard should be applied in this case. Thus, trial on this issue would serve no useful purpose.

9

Following Brower, several courts have found no seizure to have occurred in cases in which an arrestee is accidentally injured by police after having been taken into custody. For example, in Andrade v. City of Burlingame, 847 F. Supp. 760, 762 (N.D. Cal. 1994), a police officer pulled over a car that matched the description of a car driven by suspects in an assault. The officer had a police dog in his patrol car at the time of the traffic stop. Id. When he got out of his car at the traffic stop, the officer left the dog in the back seat of the patrol car with the window dividing the front and back seats partially open and the front door open. Id. The officer ordered the suspects to get out of their car and lie down on the ground. Id. The officer approached one of the suspects who had failed to immediately comply with the order. Id. At that time, without having been commanded to do so, the dog climbed over the divider and out the front door of the squad car, and bit two of the other suspects. Id. The court held that because the officer had not intended to use the dog, there was no "seizure," and consequently, no Fourth Amendment violation. Id. at 765. See also, e.g., Clark v. Buchko, 936 F. Supp. 212 (D. N.J. 1996) (finding no seizure where officer's gun accidentally discharged when person in custody backed into it, killing that person); Troublefield v. City of Harrisburg, 789 F. Supp. 160 (M.D. Pa. 1992) (finding no seizure where officer's gun accidentally discharged while being holstered, injuring handcuffed person in custody).

In this case, plaintiff offers no evidence that would indicate that the second dog attack was in any way directed by the deputies. Carlson testified that he does not believe that the deputies intentionally dropped the dog or ordered the dog to attack him the second time. (Pl. LR56.1(b) ¶ 79) Nevertheless, Carlson asks the court to infer that the officers commanded the dog to attack him the second time, based on the premise that the dog was trained to attack only

10

when commanded to do so and that Carlson had done nothing to provoke him.[4] Carlson's claim is based in "logic akin to the doctrine of *res ipsa loquitur*." See Estate of Phillips, 123 F.3d at 594 (quoting Brownell v. Figel, 950 F.2d 1285, 1292 (7th Cir. 1991)). As such, it is mere speculation that is insufficient to withstand a motion for summary judgment. See id. at 595. Because there is no evidence that the second dog attack was anything more than an accident, the court concludes that there was no Fourth Amendment violation.

The court reaches the same conclusion even if it moves past the issue of whether there was a seizure and analyzes whether the deputies' actions were reasonable following the drop of the dog. Plaintiff argues that the deputies stood by and allowed the attack to continue out of an intent to cause plaintiff harm, and that the deputies only took action to subdue the police dog after the police dog came under attack by McClintock's dog. This argument is not supported by the facts.

Plaintiff's version of the attack is that for thirty to seventy seconds, two deputies on the floor watched the police dog attack Carlson. See Pl. LR56.1(b) ¶ 70; Pl. Add'l Facts ¶ 19. After McClintock's dog attacked the police dog, one of those two deputies grabbed the police dog. See Pl. Add'l Facts ¶ 20; Pl. LR56.1(b) ¶¶ 66, 68, 69. McClintock, who had been in a bedroom at the beginning of the attack, testified that the third deputy never appeared. See Pl. LR56.1(b) ¶¶ 67, 69; Pl. Add'l Facts ¶ 19. Defendants' version is that Mordt was in the attic handing the dog

---

[4] Carlson states that Mordt made false statements in his police report and deposition testimony, and argues that this is evidence of wrongful motive. The falsity, according to Carlson, arises from Mordt's testimony that Carlson's injuries occurred in the attic and not during the second attack on the floor. However, Mordt's opinion as to where plaintiff sustained the bulk of his injuries is not the equivalent of a denial that the dog bit plaintiff the second time and is not otherwise inconsistent with the facts.

11

down to the two other deputies, and that when the dog was dropped Mordt came down the step ladder and grabbed the police dog. See Def. LR56.1(a) ¶¶ 62, 66. Defendants do not state whether McClintock's dog was attacking the police dog at the time Mordt grabbed the police dog. According to defendants, the attack lasted under a minute. See Def. LR56.1(a) ¶ 70.

The court finds that a reasonable jury would not believe plaintiff's version of how the attack ended. The undisputed evidence is that Mordt was in the attic when Carlson was apprehended, and that at the time of the second dog attack, Olsen and Mariani were with Carlson on the floor below. See Def. LR56.1(a) ¶¶ 58, 65; Pl. LR56.1(b) ¶¶ 58, 65. It makes no sense that Mordt, the dog's handler, simply disappeared after apprehending Carlson in the attic, leaving no one to hand the dog down from the attic. The court finds that the deputies on the floor did not act unreasonably by waiting for the dog's handler, who was close at hand at the top of the step ladder, to come down and subdue the dog. The court further finds that it was not unreasonable for it to have taken Mordt thirty to seventy seconds to come down the step ladder and bring the police dog under control. Accordingly, no Fourth Amendment violation occurred in the deputies' response to the second dog attack.

## IV. *Conclusion*

For the reasons stated above, defendants' motion for summary judgment is granted as to Counts I and II, and Carlson's motion for summary judgment is denied. Because this decision disposes of all the federal claims, the court declines to exercise supplemental jurisdiction over the state law claims in Counts III and IV. See 28 U.S.C. § 1367(c)(3); Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir. 1999).

12

ENTER:

*/s/ Philip G. Reinhard*
Philip G. Reinhard
United States District Judge

DATED: May 28, 2002

# United States District Court
## Northern District of Illinois
### Western Division

Ricky R. Carlson

v.

Deputy David Mordt, et al.

**JUDGMENT IN A CIVIL CASE**

Case Number: 00 C 50252

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■ Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED defendants' motion for summary judgment is granted as to Counts I and II, and Carlson's motion for summary judgment is denied. Because this decision disposes of all the federal claims, the court declines to exercise supplemental jurisdiction over the state law claims in Counts III and IV. See 28 U.S.C. § 1367(c)(3); Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir. 1999). This case is hereby dismissed in its entirety.

FILED-WD
02 MAY 29 PM 2:41
CLERK
U.S. DISTRICT COURT

Michael W. Dobbins, Clerk of Court

Date: 5/29/2002

_____
Susan M. Wessman, Deputy Clerk